## KATZ et v OHIO NATIONAL BANK

Ohio Appeals, 2nd Dist, Franklin Co

No 2491. Decided June 10, 1935

Wilson & Rector, Columbus, for plaintiffs.
Squire, Sanders & Dempsey, Cleveland,
and Hedges, Hoover & Tingley, Columbus,
for defendant.

## OPINION

By BARNES, PJ.

A VERY VITAL QUESTION FOR DETERMINATION IS WHETHER OR NOT EITHER GENERALLY OR UNDER THE PARTICULAR FACTS IN THE INSTANT CASE THE EXECUTORS HAD THE POWER TO OPERATE THE STORES AS GOING CONCERNS.

Sec 10697, GC, prescribes that executors or administrators shall sell the whole of the personal property belonging to the estate which is liable for payment of debts within three months after the date of his bond. The rule in Ohio as well as in all other jurisdictions to which our attention has been called is very definite that executors and administrators do not have the right to continue the business of the decedent except when authorized to do so under the clear provisions of the will. In the absence of such authorization, it is the positive duty of the administrator or executor to promptly take steps to liquidate by converting the personal assets into money. The leading case in Ohio is that of Peter Lucht, Admr. de bonis non of Francis Neulson, deceased v John Behrens, 28 Oh St, 231. Syllabus 2 reads as follows:

"2. The general estate, real and personal, of the testator, not embarked in such business, can not be subjected to the liabilities incurred in its prosecution in the absence of clear and explicit authority conferred by the will, even though the executor acted in good faith."

Syllabus 3 reads as follows:
"3. When by the will all the estate, real and personal, is devised subject only to the payment of debts, the devisees, as well as the creditors, have an interest in the estate, that can not be defeated or encumbered by debts contracted by the executor, not authorized by the will."

At page 239 Judge Johnson delivering the opinion makes the following observation:
"In the case at bar, the testator disposed of all his estate subject only to the payment of his debts, the funeral expenses, and costs of administration. No other liabilities incurred by the executor, however honestly incurred, can be made a burden on this bounty to his wife and minor children. The doctrine of the cases just cited is supported by numerous authorities, and may be regarded as well established."

Following the above excerpt from the opinion there are cited decisions of the courts of last resort in other states. The case of Mills v Connor, 104 Oh St, 409, also deals with the powers of administrators and executors as to the continuation and operation of testator's business. In the second syllabus speaking of executors the court says:

"He has no authority beyond that expressly conferred, and no power to act in other matters connected with the estate of the testator."

On page 418 Judge Matthias speaking for the court says the following:
"The rule is quite generally established that the representative of a decedent may not carry on the decedent's business after his death unless such authority is expressly granted, and in the absence of clear and express authority an executor may not use the personal assets of his testator to carry on the former trade or business of such testator, and such general assets are not liable for money borrowed or indebtedness incurred by the executor in carrying on such trade or business, though the executor may have acted in good faith."

The case of Rembold, Admr. v White, Admr., 7 C.C. (N.S.) 509, while primarily dealing with and denying the rights of heirs to reimbursement for money advanced in the unauthorized operation of a decedent's business on page 510 quotes with approval the above principles announced in 28 Oh St, 231.
A very full and comprehensive discussion of the subject will be found in 18 Cyc., 241, and 11 R.C.L., 153, et seq.

DID DEFENDANTS' APPLICATION AND THE GRANTING THEREOF BY THE PROBATE COURT OF FRANKLIN COUNTY, OHIO, LEGALIZE THE ACTION OF THE EXECUTOR IN CONTINUING THE OPERATION OF THE KATZ STORES AS GOING CONCERNS?

No such power is granted under the Code and it therefore follows that the Probate Court lacks jurisdiction to authorize an executor to continue the business of the decedent. The sole and only source of

right or power so to do must be found in the will of the testator; otherwise the business must be liquidated and the estate settled in conformity to the provisions of the Code. In the case of Mills v Connor, 104 Oh St 409, at page 419, Judge Matthias makes the following observation:

"The action of the Probate Court appointing the plaintiffs as trustees and directing them to conduct and operate the theater pursuant to the application of the executor can not have any effect whatever in the determination of the rights and powers of the plaintiffs. Those rights and powers are derived entirely and solely from the provisions of Item 23 of Bouson's Will, and are measured and limited by the terms of that instrument. (Atkinson v Beckett, 34 W. Va., 584.)"

WAS DECEDENT'S CONTRACTUAL OBLIGATION OF SUCH A CHARACTER AS TO REQUIRE THE OPERATION OF THE TWO STORES AS GOING CONCERNS EVEN THOUGH THERE WAS NO EXPRESS DIRECTION UNDER THE WILL SO TO DO?

Statement was made by the trust officer of the defendant executor that prior to the death of Mr. Katz he had made commitments and given orders for his spring trade. The amount and nature of those commitments were not presented in evidence, nor are we advised as to the terms of such commitments. Mr. Cohn testified that such commitments would be subject to cancellation under the circumstances. It may be that this voluntary statement of Mr. Cohn was a mere opinion and not based on knowledge of necessary facts. However, giving all evidence on this subject the most favorable interpretation to the defendant, we do not think it can be said that thereby the rule of law would be changed and the executor authorized to operate the stores as going concerns. The most that the wholesale houses could demand would be damages for failure to accept the merchandise ordered. The amount of this damage would have been infinitesimal as compared with the amount actually lost through the continued operation.

WERE THE CONTRACTUAL OBLIGATIONS OF THE DECEDENT UNDER THE 99 YEAR LEASE OF SUCH A CHARACTER AS TO AUTHORIZE THE OPERATION OF THE STORES UNTIL SUCH TIME AS THEY COULD BE SOLD TOGETHER?

The Columbus store was operated in the building owned by the decedent through his 99 year lease.

The annual charges by way of rental, taxes and assessments, etc., were in excess of $20,000.00 per year. There was also a provision in the 99 year lease obligating the decedent to construct a building on the premises at a cost of $75,000.00 not later than 1933.

The Washington C. H. business was operated in a building held under a contract of lease having several years yet to run. This lease also provided for the payment of annual rentals. We readily recognize the problems that confronted the executor in this situation and assume that the defendant was acting in good faith in an effort to preserve the assets of the estate and create a large balance through which decedent's family would receive large incomes. It developed, however, that this laudable desire did not materialize. Instead of preserving or augmenting the assets, the continued operations brought about almost total loss. It is fairly inferable that the general business condition and breakdown of values was largely responsible for defendants' failure to realize its hopes and ambitions. We think we are warranted in saying that it is a matter of common knowledge that business conditions were better immediately following the death of Mr. Katz and the appointment of defendants as executors than at the time they did sell the Columbus store, including its merchandise, accounts and 99 year lease. The defendant executor in failing to follow the strict legal duties incurred losses far beyond what would have been expected had they liquidated the personal assets within the statutory period.

In our judgment none of these situations would in law authorize the executors to operate the stores.

UNDER THE FACTS AS DISCLOSED FROM THE RECORD, ARE PLAINTIFFS ESTOPPED TO ASSERT THEIR PRESENT CLAIM AGAINST THE DEFENDANT?

This issue is raised through the answer of the defendant wherein it avers that its operation of the stores in Columbus and Washington C. H. was with the knowledge and consent and at the solicitation of the beneficiaries under the last will and testament of said decedent.

That the adult beneficiaries had knowledge of the operation of both stores is clearly disclosed under the evidence; that

such operation was at the solicitation of the plaintiffs or any of them is denied. In the application to the Probate Court for authorization to operate, none of the plaintiffs was notified of the pendency of such proceedings, nor did they file any pleading consenting to such order. As heretofore stated, the court had no jurisdiction to grant such authority to the executor, yet had the beneficiaries under the will joined in such an application, such action would have worked an estoppel and placed the evidence thereof in very positive and uncontradictible form. We must approach the determination of this question with the fact before us that Leo Katz, the decedent, entrusted the administration of his estate to his executor and not to his family. It is further disclosed from the will that even after the estate was converted into money, distribution was not made to his widow and children but to the defendant as trustee with power and authority to make investments in its discretion and pay income to the widow during her life and thereafter to his daughters or their children or heirs conditioned as to the time of death, etc. Mrs. Katz, according to her testimony, had no knowledge whatever of business.

Mr. Cohn, a son-in-law, was authorized by the adult beneficiaries to keep in touch with their interests. Many letters written by Mr. Cohn to Mr. Jones, the trust officer of the defendant executor, were introduced in evidence. Counsel for defendant urge that they unqualifiedly corroborate the testimony of the trust officer that he was operating the stores with their sanction and acquiescence. On the other hand, it is the contention of plaintiff that in the light of the oral testimony of Mr. Cohn, these letters should not be given any such construction as contended for by defendant. Under all the evidence in the case, we are unable to conclude that defendant has shown such a state of facts as would constitute an estoppel against the defendants.

The evidence is conclusive that the plaintiffs were desirous of having the estate closed up. The controverted question only goes as to whether or not the stores were to be operated until they could be sold in connection with the leasehold as a going business. The trust officer, Mr. Jones, testified that at the time he made application to operate the stores he had no knowledge that the law did not permit such operation. It is just as inferable that the plaintiff beneficiaries also lacked knowledge and if it came to their attention that the Probate Court granted the authority they would be warranted in concluding that the executor was within his legal right in continuing to operate the business of the decedent. While it is true that ignorance of the law does not excuse, yet this will not apply in the instant problem for the reason that estoppel through acquiescence or conduct only arises where there is shown a duty to speak. **Corpus Juris, Vol. 21, page 1061, Sub. 10.**

Of course, if the beneficiaries or Mr. Cohn authorizedly acting for them, expressly requested the trust officer of the executor to operate the stores as going concerns, or as claimed by Mr. Jones, such a policy was agreed upon in conference immediately following the appointment of the defendant as executor, then the defendants would be estopped to claim losses. However, on this issue of fact, there is very direct conflict. Mrs. Katz, Mrs. Cohn and Mr. Cohn all deny that they requested or agreed to any such arrangement. The other adult beneficiary and plaintiff, Mrs. Weil was not present at the trial because of sickness, consequently we do not have her testimony. The record does not show estoppel.

WHAT ARE THE RIGHTS OF BENEFICIARIES WHERE AN EXECUTOR UNAUTHORIZEDLY OPERATES THE BUSINESS OF THE DECEDENT AT A LOSS?

The rule is uniform in all jurisdictions and is very clearly set forth in 18 Cyc., 241:

"The general rule is that neither an executor nor an administrator is justified in placing or leaving assets in trade, for this is a hazardous use to permit of trust moneys; and trading lies outside the scope of administrative functions. So great a breach of trust is it for the representative to engage in business with the funds of the estate that the law charges him with all the losses thereby incurred without on the other hand allowing him to receive the benefit of any profits that he may make, the rule being that the persons beneficially interested in the estate may either hold the representative liable for the amount so used with interest or at their election take all the profits which the representative has made by such unauthorized use of the funds of the estate."

Also to the same effect see 11 R.C.L., 135, under heading "Risking Assets in Trade."

Applying this principle it therefore follows that the defendant should be held accountable for all losses incurred through the unauthorized operation of decedent's business.

## IS IT PROPER TO CHARGE DEFENDANT WITH THE APPRAISED VALUE OF THE STORE ASSETS AS SHOWN IN THE INVENTORY?

It is a general rule that the inventory and appraisal presumptively fixes the values but not conclusively. 23 C.J. §374, (Executors and Administrators).

"In actions or special proceedings inventory is presumptive evidence of the amount and value of estate both for and against the executor."

Defendant presented evidence in effect that the appraisers did not actually appraise the stock of goods in either of the two stores, but accepted as the basis, the decedent's inventory made in January preceding his death in October, together with having the same brought up to date through records of purchases and sales. In other words, the claim is made that the same method was used as the decedent would have used in making inventory for a continuing and going business.

It is disclosed from the inventory that one of the appraisers was the trust officer, Mr. Jones. The business or qualifications of the other two appraisers is not disclosed. The first account filed in the Probate Court discloses that a total of $525.00 was disbursed for this appraisement. This divided between the three would mean $175.00 to each. Presumptively on this basis of compensation the appraisers would be expected to be very expert in their line, very careful in their appraisement and not merely to act in a perfunctory manner.

There is no question had the merchandise in the stores been liquidated in the usual method, the executor could not have been charged with any amount in excess of what he received under a fair and honest sale. However, in the instant case, it appears that the executor during the time of his operation ordered new goods and commingled them with the stock on hand at the time he took charge. The defendant also presented as a witness an expert liquidator who gave an estimate of values on a percentage basis of stocks of merchandise to be sold under liquidation. This witness had no specific knowledge of the stock in the Columbus store, but dealt with the subject in a general way. There was also presented the testimony of an auditor of the Katz stores, who set up what he termed an aged inventory. By this is meant the merchandise that was more than a year old. The liquidator witness also gave evidence of values on the aged inventory basis. The difficulty with this testimony is that it is theoretical and highly speculative. It did not nor did the defendant by any other testimony give accurate evidence as to what the inventory goods actually sold at. The executor through commingling with goods subsequently ordered under its operation of the business rendered impossible any accurate analysis.

It was disclosed in the evidence that during the first year that the executor operated the business, a profit was shown and this again would present the query as to the amount of depreciation in the subsequent year and that which might arise by reason of the business depression. All in all, we think that there remains no other basis than to charge the executor with the appraised value of the merchandise in the two stores and this amount when added to the other assets of the estate would all be subject to the allowances for the payment of debts and expenses of administration. As a basis, we adopt the determination of the Common Pleas Court as set up in tabulated form on page 4 of this opinion. The net finding in the court below against the defendant was $46,130.11 with interest from October 9, 1930. We think this interest should be charged from October 30, 1928, at 6% being one year from the date of defendant's appointment. This is the date at which all debts should be paid and the estate settled. §§10740 and 10741, G.C.

The law gives to the beneficiaries an option to accept the profits of the illegally operated business by the executor or to charge the executor with the capital assets used in the business together with interest. As authority for this holding we refer to 11 R.C.L., 143, under the subheading "Risking Assets in Trade," near the center of the paragraph:

"The rule being that the persons beneficially interested in the estate may either hold the representative liable for the amount so used with interest, or, at their election, take all the profits which the representative has made."

Also see 18 Cyc. 241, under heading "Engaging in Business," wherein the identical language above quoted is used.

It is our conclusion that when the beneficiary exercises the option as in this instance to hold the executor responsible for the capital assets, it may date back to the time when such assets were so taken and used by the executor. Strictly this would

seem the week of the appointment, but we are extending the period for one year to cover the time within which debts against the estate might be presented and paid.

We think that the defendant should be entitled to an additional credit of $1917.16, being the inventory value of the Washington C. H. fixtures. These fixtures were turned over to Milton Katz with the consent of the principal beneficiary Stella Katz in consideration of the 'said Milton Katz taking over the remaining term of lease of the store and relieving the estate of further liability therefor. This was of benefit to the estate.

Considering the question of administrator's compensation, we think this matter in the final instance is within the jurisdiction of the Probate Court. The administrators' and executors' compensations are fixed by statute on a percentage basis. Any compensation beyond this amount for unusual or extraordinary services may be allowed by the Probate Court. While Mr. Jones, trust officer of the defendant, testified that no allowance was made by the Probate Court of these fees, yet there may arise the legal question as to whether or not the action of the Probate Court in its approval of the first and second accounts constitute such an allowance.

There also would arise the legal question whether or not exceptions might be taken at the time of filing of the final account and thereby open up all items in previous accounts. We do not pass on any of these questions but expressly leave it to the determination of the Probate Court. In all other matters we adopt the findings and figures of the Common Pleas Court so far as it refers to the personal estate.

Plaintiff raises the question that the $3000.00 borrowed money for operation of the Washington C. H. store should be charged against the defendant. Under certain methods of tabulation this would be proper but due to the fact that we charged the defendant with the appraised value of the stock assets this item would be improper to take into consideration in our tabulation.

## IS DEFENDANT CHARGEABLE WITH LOSS ON SALE OF 99 YEAR LEASE?

The evidence is and counsel for defendant in their brief admit that the 99 year lease at the time of sale of store, including lease had no value.

The inventory and appraisement of the executor returned a value of $250,000.00. Just at the time of the death of Mr. Katz we were entering on a financial depression the scope and effect of which is now fairly well known to all of us. Nothing like it has ever happened in the history of this country. It came on to us very stealthily and we now know of it as we look back, but we did not recognize it in its inception Optimism was hard to overcome. The feeling that recovery was around the corner was in the minds of all of us. Unfortunately we have now reached the stage where pessimism has seized us.

This 99 year lease under the powers and discretion as given to the executor might have been held as an investment. In order to charge with liability it is necessary for the plaintiff to show that the action of the defendant was in disregard and neglect of its duties.

Plaintiff in its petition recognized this principle when counsel sought and obtained leave to amend at bar by inserting "in gross disregard and neglect of its duties as executor and trustee and in its personal interests."

In support of this contention, plaintiff presented evidence that on or about April, 1928, a bona fide bid was made to the executor to purchase the 99 year lease at a consideration of $165,000.00 net. A check for $10,000.00 accompanied the bid. The evidence surrounding this bid and its final withdrawal is not very satisfactory. Apparently the bid was received on the 9th and on the 10th the controlling board of the bank was called together and passed a resolution offering to sell at a figure $5000.00 in excess of that offer provided the action would be satisfactory to Mrs. Katz. Under the law it was not necessary to consult Mrs. Katz, but no criticism can be offered of the desire so to do. The broker who presented the bid was advised of the board's action and immediately withdrew the offer. No explanation is made as to the reason. We think it is accepted common knowledge that real estate transactions are rarely consummated on the first figure presented. This is due to the fact that there is no mathematical method of determining absolute values. Many elements enter into the determination of what buyers will give and what sellers will take. There is no question that under subsequent developments it would have been the part of wisdom for the defendants to have accepted the offer the second it was made. The fact that it was not accepted does have some bearing on the arguments relative to the personal estate, but it is not determinative as to this 99 year lease. As to the personal estate there was the absolute un-

qualified duty to liquidate, whereas no such duty applied to the 99 year lease. Counsel for plaintiff urge that the motive for refusing the bid was that the offer to purchase was in effect being made by a competitor bank and that defendants were interested in preventing any enlargement of the competitor's facilities. We have searched the record very carefully and can not find support for this contention. We have no difficulty in arriving at the conclusion that there was an error in judgment in not accepting the $165,000.00 offer before there was the opportunity to withdraw it, but we only determine this in the light of subsequent conditions unknown and unforeseen. We are unable to find evidence of a gross disregard or neglect of duty of the executor at the time, nor do we find evidence sustaining the contention that this action was actuated by a personal interest.

We are in accord with the Common Pleas Court wherein he says that he does not feel warranted in making a finding in favor of plaintiffs in regard to the failure of defendant bank to sell the 99 year lease.

The judgment will be returned for the plaintiff in accordance with this opinion. Costs will be taxed against the defendant. Exceptions will be allowed to both parties if desired.

HORNBECK and BODEY, JJ, concur.